## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO.** |
| **v.** | **VIOLATION:** |
| **RICHARD SHYKORA** | **18 U.S.C. § 371 (Conspiracy to Commit Money Laundering)** |
| **Defendant.** | |

## STATEMENT OF THE OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States, by and through its undersigned attorneys, and RICHARD SHYKORA, with the concurrence of his attorney, Mark Hunter, stipulate and agree that the following facts fairly and accurately describe SHYKORA'S conduct in the offense to which he is pleading guilty. These facts do not constitute all of the facts known to the parties concerning the charged offense and related conduct. This statement is being submitted to demonstrate that sufficient facts exist to establish that SHYKORA committed the offense to which he is pleading guilty. SHYKORA knowingly, voluntarily, and truthfully admits to the facts set forth below.

### *Background*

1. RICHARD SHYKORA was a citizen of Canada who resided in Canada.

2. Co-Conspirator-1 ("CC-1") was a U.S. citizen who resided in Michigan.

3. Co-Conspirator-2 ("CC-2") was a citizen of Canada who resided in Canada. SHYKORA and CC-2 have known each other for over twenty years.

4. Co-Conspirator-3 ("CC-3") was a citizen of Canada who resided in Turkey. SHYKORA knew that CC-3 had been charged with federal crimes in the United States in connection with a securities fraud scheme, and that CC-3 resided in Turkey to avoid arrest.

1

5.      Individual-1 was a citizen of Canada who worked for Cryptocurrency Exchange-1. SHYKORA knew that a federal court in the United States had ordered Individual-1 to pay millions of dollars in connection with a Securities and Exchange Commission civil action alleging that Individual-1 had engaged in securities fraud.   SHYKORA also knew that Quebec's securities regulator had fined Individual-1 millions of dollars in connection with a securities fraud scheme.

6.      Minerco, Inc. traded publicly under the stock symbol MINE in the Over-the-Counter-Markets ("OTC") as a penny stock.  Minerco was promoted as being in the business of developing and distributing psilocybin mushrooms, also known as magic mushrooms or psychedelic mushrooms.

7.      Cryptocurrency Exchange-1 was a cryptocurrency trading, exchange, and custodian services company with offices in the United States and Canada that allowed its users to, among other things, deposit currency in U.S. dollars and then buy, sell, and transfer cryptocurrency to others.  Cryptocurrency Exchange-1 also allowed users to withdraw currency in U.S. dollars and transfer the funds to traditional bank accounts.

8.      Company-1 was a company organized in Dubai that purported to be operated by a Turkish citizen.

9.      Bank-1 was a financial institution incorporated and headquartered in the Bahamas.

10.     Company-2 was a company organized in Virginia in the name of Individual-2.

11.     Individual-3 served as the publicly identified CEO of Minerco.

***Conspiracy to Commit Money Laundering***

12.     As more fully described below, beginning at least as early as in or around September 2020 and continuing through at least in or around June 2022, SHYKORA did knowingly and intentionally conspire with others, including but not limited to CC-1, CC-2, and

CC-3, to commit certain offenses against the United States, namely international concealment money laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i) and engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957, while knowing the unlawful purpose of the agreement and joining in it willfully, that is, with the intent to further the unlawful purpose, and at least one of the co-conspirators during the existence of the conspiracy knowingly committed at least one overt act in order to accomplish some object or purpose of the conspiracy.

13.    In sum, SHYKORA conspired with CC-1, CC-2, and CC-3 to launder approximately $7 million from the sale of nearly one billion Minerco shares from outside the United States to or through a place in the United States, knowing that the funds represented the proceeds of some form of unlawful activity and knowing that the transfer of the funds was designed, in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds.   SHYKORA also conspired with CC-1, CC-2, and CC-3 to engage in a monetary transaction affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity.   In furtherance of the conspiracy, SHYKORA, among other things, helped distribute the proceeds from the sale of Minerco shares; recruited CC-2 to assist in laundering the funds; received stock trading instructions from CC-1 and communicated the instructions to other co-conspirators; and worked to obtain documentation from CC-1 to make the sale of Minerco stock on behalf of CC-1 appear to be authorized because the shares were not held in CC-1's name.   SHYKORA knew that the transfer of funds was designed, in part, to conceal the nature, location, source, ownership, or control of the proceeds because, among other things, SHYKORA knew that CC-1 was effectively in charge of Minerco, but had recruited Individual-3 to be the publicly identified CEO of Minerco;

the one billion Minerco shares were controlled by CC-1, but the shares were held in the name of Company-2, which on paper, was controlled by Individual-2; there was no written authorization from Company-2 or Individual-2 to sell the Minerco shares or to distribute proceeds from the sale of the Minerco shares; SHYKORA completed a compliance questionnaire for Bank-1 that falsely stated that the one billion Minerco shares were beneficially owned and controlled by Company-1 when, in fact, SHYKORA knew that CC-1 beneficially owned and controlled the shares.

14.     It was the object of the conspiracy for SHYKORA, CC-1, CC-2, and CC-3, to unlawfully enrich themselves by laundering the proceeds of the sale of one billion Minerco shares, to conceal the nature, location, source, ownership, or control of the proceeds, and to prevent detection of the laundering activity.

15.     SHYKORA and CC-1 met in or around 2018 while SHYKORA served as CEO of a public company that traded on OTC Markets as a penny stock.

16.     In or around October 2019, CC-1 told SHYKORA that he was purchasing Minerco.

17.     By at least October 2019, SHYKORA knew that CC-1 had a criminal history and SHYKORA had read an article titled: "Judge calls businessman [CC-1] 'a criminal,' which among other things, stated: CC-1 "pleaded guilty to two misdemeanor violations of the credit services protection act while his business . . . pleaded guilty to two felony counts of obtaining money by false pretenses and 13 misdemeanors."

18.     By at least October 2019, SHYKORA also knew that there were other negative news articles about CC-1 on the internet, including an article titled: "He claimed diplomatic immunity. Feds at the Charlotte airport took his $250K anyway." Among other things, the article stated: "[CC-1] was charged in Michigan with obtaining money under false pretenses . . . [CC-1] also was arrested on felony drug-trafficking charges in California involving the possession of more

than $100,000 in cash" and "Earlier this year, [CC-1] was sentenced for defrauding a group of Michigan residents who hired him and his company for help in keeping their homes."

19.     In or around October 2019, CC-1 told SHYKORA that he had recruited Individual-3 to be the CEO of Minerco.  SHYKORA had some interactions with Individual-3, and Individual-3 did not appear knowledgeable about running a public company.  SHYKORA knew that CC-1 asked Individual-3 to be the CEO of Minerco because there was negative news about CC-1 on the internet—including about CC-1's criminal history—and CC-1 did not want the public to know CC-1 was effectively in-charge of Minerco.

20.     SHYKORA helped CC-1 with some of Minerco's filings with the Nevada Secretary of State and with some of Minerco's public filings with OTC Markets, and drafted some corporate documents for Minerco, such as corporate resolutions.

21.     By at least September 2020, CC-1 told SHYKORA that he was unable to deposit and sell one billion Minerco shares that CC-1 controlled, and SHYKORA agreed he would try to help CC-1 deposit and sell the shares.  SHYKORA knew that CC-1 held the shares in the name of Company-2 to conceal that CC-1 controlled the shares.

22.     SHYKORA knew that it was likely impossible to deposit and sell one billion Minerco shares at any U.S. or Canadian financial institution because Minerco was a penny stock. SHYKORA therefore asked CC-2 to help sell the one billion Minerco shares on behalf of CC-1. CC-2 then contacted CC-3 and inquired if CC-3 could help sell the Minerco shares.  CC-2 then informed SHYKORA that CC-3 knew of a company, called Company-1, that could assist in selling the one billion Minerco shares.  SHYKORA believed that CC-3 was living in Turkey to avoid arrest by U.S. authorities.

23.     SHYKORA, CC-1, CC-2, CC-3, and Company-1 agreed in or around 2020 that

5

they would share in the proceeds of the sale of the one billion Minerco shares.  It was SHYKORA's understanding that the proceeds would be divided as follows: (1) 10% to SHYKORA; (2) 10% to CC-2; (3) 10% to CC-3; (4) 20% to Company-1; and (4) 50% to CC-1.

24.    To help ensure that the proceeds from the sale of the Minerco shares were not frozen by any financial institution, CC-2 recommended that SHYKORA, CC-1, CC-3, and Company-1 open accounts at Cryptocurrency Exchange-1, which they all did.  SHYKORA knew that CC-2 recommended Cryptocurrency Exchange-1 because CC-2 knew Individual-1, who worked for Cryptocurrency Exchange-1, and Individual-1 would provide CC-2 with a level of access to information and control over funds not available to the public.

25.    By in or around February 2021, the one billion Minerco shares were deposited into an account at Bank-1 in the name of Company-1.   As part of Bank-1's due diligence and compliance review process about the one billion Minerco shares, Bank-1 requested that a compliance questionnaire be completed.  SHYKORA completed the questionnaire and falsely stated that "[t]he shares are beneficially owned and controlled by [Company-1]."  Although SHYKORA genuinely believed that the shares were held in the name of Company-1 on paper, he also knew that, in practice, CC-1 beneficially owned and controlled the shares.  SHYKORA also falsely responded: "No" to the question: "Is/Are the shareholder(s) a past or present officer, insider, director, affiliate, control person or 5% owner of the issue?" when, in fact, SHYKORA knew that CC-1 was, at a minimum, an insider and control person at Minerco.

26.    In or around February 2021, SHYKORA learned that the Minerco shares could begin to be sold at Bank-1, and SHYKORA informed CC-1 and CC-2.

27.    Generally, to sell the Minerco shares, CC-1 provided instructions on the quantity, price, and timing of Minerco shares to be sold to SHYKORA, who communicated the instructions

to CC-2.  CC-2 then communicated the instructions to CC-3, and CC-3 then communicated the

instructions to Company-1.  For example, CC-1 texted SHYKORA on or about February 10, 2021:

"Hey I think the mark[e]t can absorb a higher number [of shares]," on or about February 11, 2021,

"Let's get another 100m [shares] out," and on or about February 12, 2021: "Have them hold first

few hrs so it can breathe.  My tweet was strong 600 retweets[.]"  SHYKORA understood CC-1's

February 12, 2021 text message to mean that CC-1 wanted to wait a few hours before selling

Minerco shares because CC-1 had sent a promotional tweet about Minerco.

28.     By at least February 2021, SHYKORA knew that CC-1 was involved in promoting

Minerco stock.  At one point, CC-1 told SHYKORA that he had a group of people working for

him that promoted Minerco on message boards and social media.

29.     By at least in or around April 2021, SHYKORA knew that CC-1 was directing

SHYKORA to trade Minerco stock based on CC-1's knowledge of material nonpublic information

about anticipated promotional activity.  For example, on or about April 19, 2021, CC-1 texted

SHYKORA: "How much can we move[?]" and SHYKORA responded: "It is trading alright . . .

20-25M [shares] possibly," CC-1 responded: "Ok. Let's move it[.] We got news thru out [sic] the

week," and SHYKORA responded: "Ok . . . I will let them know[.]"

30.     On May 26, 2021, the SEC issued an order suspending trading in Minerco, which

SHYKORA reviewed.  The Order stated, among other things, that "the public interest and the

protection of investors require a suspension in the trading of the securities of Minerco . . . because

of questions and concerns regarding the adequacy and accuracy of information about the Company

in the marketplace and unusual and unexplained activity affecting the market for its securities."

31.     Between on or about February 10, 2021 and May 26, 2021 (the date of the trading

suspension), at CC-1's direction, SHYKORA, CC-2, CC-3, and Company-1 worked together to

successfully sell approximately 928 million of the one billion Minerco shares held at Bank-1 for a total of approximately $8.4 million in trading proceeds.

32.     Between on or about February 22, 2021 and March 30, 2021, $5.8 million was transferred from Company-1's account at Bank-1 to Cryptocurrency Exchange-1 from the proceeds of the sale of Minerco stock as follows: $1.5 million on February 22, 2021; $2 million on February 26, 2021; $1.8 million on March 6, 2021; $500,000 on March 30, 2021.

33.     Between in or around February 2021 to June 2022, SHYKORA received approximately $1,510,210.00 from the sale of Minerco stock into his Cryptocurrency Exchange-1 account as follows:

| Approx. Date | Currency | Amount | Approx. Value (USD) |
|---|---|---|---|
| 2/22/2021 | BTC | 19.5776 | $1,061,249.00 |
| 2/26/2021 | USDT | 199,500 | $199,500.00 |
| 3/5/2021 | USDT | 175,000 | $175,000.00 |
| 3/31/2021 | USDT | 49,461 | $49,461.00 |
| 6/15/2022 | USD | 25,000 | $25,000.00 |
| | | **TOTAL** | $1,510,210.00 |

34.     On or about February 23, 2021, SHYKORA transferred approximately 16.236 Bitcoin valued at approximately $792,000 from his Cryptocurrency Exchange-1 account to CC-1's Cryptocurrency Exchange-1 account, which represented proceeds from the sale of Minerco shares.

35.     On or about June 16, 2021, CC-2 texted SHYKORA a link to an online investor message board with numerous posts stating that Minerco had engaged in wrongdoing and CC-2 also texted SHYKORA: "Good for a few laughs, but very scary shit. This guy [i.e. CC-1] is a fcking careless clown." The link CC-2 texted SHYKORA contained posts, such as one from June 1, 2021 stating: "This is the guy running the Minerco scam 100%" with a link to the October 2019 article SHYKORA had previously read, titled: "Judge calls businessman [CC-1] 'a criminal.'"

Further, a June 14, 2021 post stated: "I smell a pump and dump scheme[.]"

36.     During and in furtherance of the conspiracy, SHYKORA and CC-2 repeatedly requested that CC-1 provide documentation establishing that Company-2 authorized CC-1 to obtain the proceeds from the sale of the Minerco stock to make the transaction appear legitimate. For example:

  a. On or about July 8, 2021, CC-2 texted SHYKORA: "I don't trust anything out of his [i.e. CC-1's] mouth.  It literally would take 5 mins or less to get [Individual-2's] signature and email it back."

  b. On or about August 3, 2021, CC-2 texted SHYKORA: "Send stupid [i.e. CC-1] a txt, he said he would have agreement today," and SHYKORA responded: "Ok I will[.]"

37.     By at least in or around June 2021 to in or around January 2022, SHYKORA and CC-2 also repeatedly requested documentation from CC-1 to document that CC-1 owned and controlled the one billion Minerco shares.  Finally, on or about January 8, 2022, CC-2 forwarded SHYKORA an email from a person identifying themselves as a representative of a realty company that stated: "Please see executed contract of my acquisition of [Company-2]."  The email attached a contract purporting to show that a realty company had acquired Company-2, except that Company-2 was misspelled in the contract and CC-2 told SHYKORA that he suspected that the signature that purported to be on behalf of [Company-2] was not genuine.

38.     Between in or around February 2021 and June 2022, SHYKORA transferred approximately $545,126.23 in proceeds from the sale of Minerco stock from his account at Cryptocurrency Exchange-1 to his personal bank account at a U.S.-headquartered financial institution ending in account number 5652 and his personal bank account at Canadian-headquartered financial institution ending in account number 0335 as follows:

| Receiving Account | Approx. Date | Amount (USD) |
|---|---|---|
| x0335 | 2/25/2021 | $49,950.00 |
| x0335 | 3/1/2021 | $99,950.00 |
| x5652 | 3/8/2021 | $49,930.00 |

| x5652 | 3/18/2021 | $49,930.00 |
| x0335 | 3/18/2021 | $99,950.00 |
| x0335 | 4/23/2021 | $12,800 ($16,000 CAD) |
| x0335 | 4/23/2021 | $53,560 ($66,950.00 CAD) |
| x0335 | 9/10/2021 | $99,955.00 |
| x0335 | 4/14/2022 | $4,146.23 |
| x0335 | 6/15/2022 | $24,955.00 |
| **TOTAL** | | **$545,126.23** |

39.     These funds have represented the vast majority of SHYKORA'S income during this time-period.  SHYKORA used these funds on among other things, the purchase of a lakefront property in Brosseau, Alberta, Canada for $95,000 CAD in or around April 2021, and other personal expenditures.

40.     The above listed transactions were conducted in U.S. dollars except for the April 23, 2021 transfers, which were conducted in Canadian dollars.

## DEFENDANT'S ACCEPTANCE

I have read the foregoing Statement of Offense, and I have discussed it fully with my attorney, Mark Hunter. I fully understand this proffer and I acknowledge its truthfulness, agree to it, and accept it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this proffer fully.

Date: 08/16/2024

Richard Shykora
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read every page constituting the government's statement of offense related to my client's guilty plea. I have reviewed the entire proffer with my client, Richard Shykora, and have discussed it with him fully. I concur in my client's agreement with and acceptance of this proffer.

Date: 8/20/24

Mark Hunter
Attorney for Defendant